UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS  DIVISION

BRIAN D. GRIGSBY,                 )
         Plaintiff,              )
                                   )
   vs.                           )          1:07-cv-1649-RLY-JMS
                                   )
RAY LaHOOD, Secretary of the United   )
States Department of Transportation,    )
         Defendant.         )

**ENTRY ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff, Brian D. Grigsby ("Plaintiff"), is a former employee of the Federal

Aviation Administration ("FAA").  Following a reduction in force ("RIF") in 2005,

Plaintiff applied for four different positions at the Indianapolis Air Traffic Control Center

("Indianapolis Center"), and was not selected for any of those positions.  Plaintiff now

brings this employment discrimination suit against the Secretary of the United States

Department of Transportation[1] ("Defendant"), alleging that he was not selected for these

positions due to his race/national origin.  Defendant now moves for summary judgment.

For the reasons set forth below, the court **GRANTS** Defendant's motion.

---

[1] On January 26, 2009, Ray LaHood became the Secretary of the United States
Department of Transportation.  Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure,
Ray LaHood, in his official capacity, is substituted as the defendant in this action.

I.      **Facts**

        A.      **The Indianapolis Air Traffic Control Center**

1.      The Indianapolis Center, a FAA Level 12 facility, provides en-route air traffic

        control service for Eastern Illinois, Southern Indiana, Southern Ohio, Western

        West Virginia, Kentucky, and Northern Tennessee.  (Declaration of David Boone

        ("Boone Dec.") ¶ 4).  The estimated aircraft traffic count for the Indianapolis

        Center in Calendar Year 2005 was six million, and the Center's airspace covered

        77,000 square miles.  (*Id.*; Deposition of Brian Grigsby ("Plaintiff Dep.") at 83;

        Testimony[2] of Kathryn Hughes ("Hughes Test.") at 97-98).

2.      The Indianapolis Center is composed of seven operational areas of specialization

        as well as the Traffic Management Unit ("TMU"), and staff and technical support

        offices.  (Boone Dec. ¶ 5).  Each of the seven operational areas consists of between

        five and seven sectors of operation.  (*Id.*).

3.      In 2005, the management team consisted of an Air Traffic Manager, an Assistant

        Air Traffic Manager, four Support Managers, and six Operations Managers.  (*Id.*).

        The Air Traffic Manager at that time was David Boone, and the Assistant Air

        Traffic Manager was Kathryn Hughes.  (Testimony of David Boone ("Boone

        Test." at 138; Hughes Test. at 39.  First-level supervisory duties were assigned to

        the Operations Supervisors, who supervised the air traffic operations and reported

---

[2] References to "Testimony of [witness name ]" refers to testimony taken in the EEO
hearing held on June 19-20, 2007, in *Grigsby v. Peters*, EEO No. 470-2006-00065X.

2

directly to their respective Operations Managers.  (Boone Dec. ¶ 5).  Each

Operations Supervisor supervised a crew of Air Traffic Control Specialists

("ATCSs").  (*Id*.).  The number of employees on each crew varied.  (*Id*.).

4.    Fully Certified Professional Controllers ("CPC"), formerly known as Full

Performance Levels ("FPL"), are controllers who are certified to operate all of the

positions or sectors in one of the seven areas of operations covered by the

Indianapolis Center.  (Boone Test. at 164; Testimony of Sandra Granger ("Granger

Test.") at 397; Boone Dec. ¶ 17).

5.    Becoming a CPC consists of four stages of classroom and on-the-job training and

typically takes approximately 36 months to complete.  (Boone Dec. ¶ 18; Hughes

Test. at 76; Boone Test. at 159-60, 183, 201-02).

6.    Air Traffic Controllers are classified within the FAA personnel system as FAA

2152-series, whether they work at an en-route air traffic control service, such as

the Indianapolis Center, or in a tower or an automated flight service station (or

"AFSS") environment.  (Declaration of Debra Larson ("Larson Dec.") ¶ 4; Hughes

Test. at 39; Plaintiff Test. at 222-23).  Not all 2152s perform the same functions, or

have the same qualifications.  (Larson Dec. ¶ 4).  Further, even if a 2152 controller

is found to meet the minimum qualification requirements for a position, the

controller may not be well qualified for the position or be as qualified to perform

the functions of a 2152 controller at an en-route facility without additional

training.  (*Id*.).

7.    CPCs, whether employed at an en-route facility, such as the Indianapolis Center, or at an airport control tower facility, such as the Indianapolis Airport Air Traffic Control Tower, separate and control aircraft during takeoffs, landings, and while airborne, and separate aircraft on the airport runway from potential obstructions. (Boone Dec. ¶ 22; Plaintiff Dep. at 31; Hughes Test. at 72-73, 108, 110).

8.    Air Traffic Controllers at an automated flight service station do not separate aircraft in flight, but instead provide weather briefings and flight planning services to pilots, either in person or over the telephone or aircraft radio frequency, and issue and cancel Notices to Airman, which alert pilots to significant restrictions to aviation. (Boone Dec. ¶ 22; Plaintiff Dep. at 21-24, 27-30, 32, 85).

9.    A certified controller at an AFSS is called an FPL, not a CPC. (Granger Test. at 397).

**B.    Plaintiff Works for the Indianapolis Center and Transfers to an Automated Flight Service Station**

10.   In January 1991, Plaintiff began his employment with the FAA through a co-op learning program. (Plaintiff Dep. at 44). Eventually he was hired as a developmental Air Traffic Controller in 1993 at the Indianapolis Center. (*Id*. at 47). In January 1997, Plaintiff completed two radar positions and became a radar associate controller.[3] (*Id*. at 50, 52; Hughes Test. at 73; Boone Dec. ¶ 16).

---

[3] The equipment Plaintiff trained on had been replaced with different equipment by 2005. (Hughes Test. at 109; Boone Dec. ¶ 19).

11.     In order to become a CPC and qualified to work as a controller without active
        supervision at the Indianapolis Center, Plaintiff needed to complete four more
        radar positions.  He did not complete that training. (Plaintiff Dep. at 51, 64-66;
        Hughes Test. at 73, 107).

12.     On September 1, 1997, Plaintiff withdrew from training at the Indianapolis Center
        and requested a lateral reassignment to the Terre Haute Automated Flight Service
        Station, where he began to work.  (Plaintiff Dep. at 31, 67-68, 81-82, 84; Boone
        Dec. ¶ 19).

        **C.     Plaintiff Discovers His Native American Heritage**

13.     In 1997, Plaintiff discovered his Native American heritage.  (Declaration of Brian
        Grigsby ("Plaintiff Dec.") ¶ 37).  His great-grandparents were part Cherokee,
        Sioux, and Apache.  (*Id.* ¶¶ 71-73).

14.     Plaintiff testified that when he began his employment with the FAA, he indicated
        on a personnel form that his race was Caucasian.  After learning of his Native
        American heritage, however, he changed the forms in his personnel file to reflect
        his race/national origin as "Native American."  (Plaintiff Dep. at 232).

        **D.     Beginning in 2000, the Indianapolis Center Underwent Significant
                 Changes**

15.     Beginning in 2000, the Indianapolis Center underwent significant changes in
        procedures, automation, and infrastructure.  (Boone Dec. ¶ 19; Plaintiff Dep. at
        169).  Some of the most significant changes included the Display System

                                            5

Displacement ("DSR"), which provides continuous real-time, automated support to air traffic controllers for the display of aircraft, flight data, and other critical control information; the Voice Switching and Control System Training and Backup Switch ("VSCS Training and Backup Switch"); and the User Request Evaluation Tool ("URET"), which is a conflict probe decision support system and allows for the electronic presentation of an aircraft's flight plan data.  (Boone Dec. ¶ 19).

16.     One of the most substantial procedural changes was the introduction of the Domestic Reduced Vertical Separation Minima ("DRVSM").  (*Id*.).  The DRVSM reduced the separation standards from 2,000 feet vertical to 1,000 feet vertical between the altitudes of 29,000 and 41,000 feet.  (*Id*.).  The change was so significant that all controllers and front-line managers received classroom and simulation training.  (*Id*.).

        **E.     Plaintiff Is Subject to a Reduction In Force**

17.     In 2005, the automated flight service stations nationwide became privatized. (Plaintiff Dep. at 35-36, 88).

18.     Plaintiff and other employees employed by the automated flight service stations were subject to a RIF.  (*Id*. at 107).  As a RIF employee, Plaintiff was entitled to certain benefits as an FAA employee.  (Granger Test. at 415-416; Larson Dec. ¶ 7).  In 2005, Plaintiff could be considered under the Selection Priority Program for lateral or lower-grade positions for which he was considered well-qualified.

6

(Granger Test. at 415; Larson Dec. ¶ 7).  The policy did not apply to positions that were promotions.  (Larson Dec. ¶ 7).  Further, selection priority did not apply to positions at Level 9 or higher terminals.  (*Id*.).

19.    In 2005, Plaintiff accepted a position with Lockheed Martin to perform the same duties he performed while employed by the FAA in Terre Haute.  (Plaintiff Dep. at 20-21, 28, 36, 87-88).  Plaintiff worked for Lockheed Martin from October 2005 to March 2007.  (*Id*. at 20).

### F.    Plaintiff Applies for Vacancies at the Indianapolis Center

20.    In 2005, four vacancy announcements were posted for positions at the Indianapolis Center.  (Hughes Test. at 40).  The announcements were for four Operations Supervisor positions; one temporary Operations Supervisor not to exceed 120 days; three Support Specialist positions not to exceed two years; and nine Traffic Management Coordinator positions.  (Larson Dec. ¶¶ 3, 8).  These positions were promotions for Plaintiff.  (Plaintiff Dep. at 234-35; Larson Dec. ¶ 8, Att. 3c, 4c, 5c, 6c).

21.    FAA directives require that Operations Supervisors and Traffic Management Coordinators maintain operational currency as CPCs in en-route environments, such as the Indianapolis Center.  (Boone Dec. ¶ 20).  Support Specialists are required to maintain operational currency at the option of the Air Traffic Manager. (*Id*.).  Boone required that the selectees for the Support Specialist positions being advertised maintain operational currency.  (*Id*.; Larson Dec. ¶ 8, Att. 5a; Boone

7

Test. at 182).

22.   The Human Resources Department of the Great Lakes Regional Office in Des
Plaines, Illinois, is responsible for posting the vacancy announcements after
receiving information from the facility.  (Granger Test. at 385, 392-930).

23.   Once the vacancy announcement application period closes, Human Resources
determines which applicants meet the minimum qualifications under the vacancy
announcement.  (Granger Test. at 393, 398-99).

24.   After the candidates who have met the minimum qualifications under the vacancy
announcements are identified, Human Resources prepares a certificate of eligibles
or a "selection list."  (*Id*. at 401).  This is the list from which a selecting official
may select a candidate for a position.  (*Id*.).

25.   Human Resources then mails the certificate of eligibles, along with the
applications of the candidates who are listed on the certificate, to the selecting
official.  (*Id*. at 403).

26.   After making a selection from the certificate, the selecting official returns the
certificate and applications to the Human Resources Office.  (*Id*. at 404-05).  The
Human Resources Office contacts the selected candidates to make a tentative job
offer, as well as notifies the candidates who were not selected.  (*Id*. at 405).

F.   **Operations Supervisor Positions**

27.   On March 23, 2005, five positions for an Operations Supervisor were announced
under Vacancy Announcement No,. AGL-AT-05-085-77732.  (Larson Dec. ¶ 8,

Att. 3a).  The announcement closed on April 12, 2005.  (*Id*.).

28.  On May 5, 2005, the certificate of eligibles and applications were provided to
Boone, the selecting official.  (*Id.* ¶ 8, Att. 3i-3m; Boone Test. at 140).  Eleven
candidates were listed on the certificate, including Plaintiff.  (*Id*.).

29.  The Operations Supervisor provides first-line supervision to a team of
developmental Air Traffic Controllers and CPCs.  (Boone Test. at 144, 159;
Larson Dec. ¶ 8, Att. 3b).  The Operations Supervisor is required to have an
intimate knowledge of whether the controllers are properly and safely performing
their duties.  (Boone Test. at 145; Larson Dec. ¶ 8, Att. 3b; Boone Dec. ¶ 20).
Further, the Operations Supervisor is required to be fully certified and to maintain
that currency by acting as an Air Traffic Controller several hours per month.
(Boone Test. at 145-46; Boone Dec. ¶ 20).

30.  All of the candidates on the certificate, including Plaintiff, were interviewed for
the positions.  (Plaintiff Dep. at 170).  The interviews were conducted by Randy
Smith, Quality Assurance Manager; Karen Davison, Human Resource Manager;
Ron Bishop, Operational Manager; and Jeff Johnson, Operational Manager.  (*Id*. at
175).

31.  Plaintiff was questioned about the fact that he was not a CPC in the en-route
environment during his interview.  (*Id*. at 177-78).

32.  The panel recommended Plaintiff and another candidate named Kirby (last name
unknown) for the position based solely on their interviews.  (Affidavit of Jeffrey

Johnson ("Johnson Aff.") at 5; Hughes Test. at 95-96).

33.    Boone considered the interview panel's recommendations during his evaluation of the candidates.  (Boone Test. at 156).

34.    Boone also discussed the candidates with other managers at the Indianapolis Center.  (Hughes Test. at 90, 96, 113; Boone Test. at 155-56).

35.    Hughes made recommendations to Boone as well.  (Hughes Test. at 90).

36.    On August 1, 2005, Boone selected Anita Schneider, Cathy Hagen, Christopher Johnson, Michael Silvius ("Silvius"), and Jeffrey Chester for the positions of Operations Supervisors.  (Boone Test. at 180-81; Larson Dec. ¶ 8, Att. 3i-3m).

37.    Each of these candidates were CPCs in the en-route environment at the time of their selections and had current experience in the en-route environment.  (Boone Dec. ¶ 24; Plaintiff Dep. at 190).  None of them required training to reach certification prior to beginning the duties of their positions.  (Boone Dec. ¶ 24).

38.    Boone did not select Plaintiff for one of the positions because Plaintiff did not have the direct experience with the new equipment at the Indianapolis Center nor was he a CPC with the ability to supervise fully certified Air Traffic Controllers. (Boone Test. at 159-60).

39.    Had Plaintiff been selected for the position, since he was not a CPC, he would have been unable to perform the duties of the position, which included maintaining operational currency by performing the duties of an Air Traffic Controller eight hours per month.  (Boone Dec. ¶ 20).  In fact, selection of Plaintiff would have

required his completing the developmental Air Traffic Controller training program, which would take years, before he could perform the duties of that position. (*Id.* ¶¶ 18, 19).

40.     On September 22, 2005, Plaintiff was notified that he was not selected for the position. (Larson Dec. ¶ 8, Att. 3n).

### G.     Operations Supervisor (Temporary Position NTE 120 Days) Position

41.     On April 13, 2005, a temporary position not to exceed 120 days for an Operations Supervisor was announced under Vacancy Announcement No. AGL-AT-05-01 13-78303. (Larson Dec. ¶ 8, Att. 4a). The vacancy announcement closed on May 3, 2005. (*Id.*).

42.     The duties of this position were the same as for the Operations Supervisor, except the position was for 120 days. (Plaintiff Dep. at 193; Larson Dec. ¶ 8, Att. 4a, 4b).

43.     On May 18, 2005, the certificate of eligibles and the candidates' applications were provided to the selecting official, Boone. (Larson Dec. ¶ 8, Att. 4d; Boone Test. at 140). The certificate contained three names, including Plaintiff's, in "score order."[4] (Larson Dec. ¶ 8, Att. 4d). Plaintiff was listed third on the list. (*Id.*; *see also* Plaintiff's Ex. 23).

44.     On September 30, 2005, Boone returned the certificate with no selection made.

---

[4] An applicant's score was based upon education and awards. (Granger Test. at 402, 428). The actual scores, however, were never provided to the selecting officials for consideration. (*Id.* at 428). Rather, in certain circumstances, the applicants' names were listed in a document given to the selecting officials in "score order." (*Id.*).

(Hughes Test. at 68; Boone Test. at 177; Larson Dec. ¶ 8, Att. 4e; Plaintiff Dep. at 193).

45.  Neither Boone nor Hughes remembers why no candidate was selected for the 120-day Operations Supervisor position and the certificate allowed to expire.  (Hughes Test. at 68; Boone Test. at 170-174).

46.  However, had Plaintiff been selected for the position, since he was not a CPC, he would not have been able to perform the duties of the position, which included maintaining operational currency by performing the duties of an Air Traffic Controller for eight hours per month.  (Boone Dec. ¶ 20).

47.  Selection of Plaintiff for the 120-day position would have required his completing the development Air Traffic Controller training program, which would take years, before he could perform the duties of the position.  (*Id.* ¶¶ 18-19).

**H.  Support Specialist Positions**

48.  On July 13, 2005, three positions for a Support Specialist were announced under Vacancy Announcement No. AGL-AT-05-149-79646M.  (Larson Dec. ¶ 8, Att. 5a).  The positions were temporary positions not to exceed two years.  (*Id.*; Hughes Test. at 125).  The announcement required that the selected candidates maintain currency so that they could work the radar system and direct traffic.  (Granger Test. at 394-95; Boone Dec. ¶ 20; Larson Dec. ¶ 8, Att. 5a; Boone Test. at 182).

49.  The announcement closed on August 2, 2005.  (Larson Dec. ¶ 8, Att. 5a).

50.  The Support Specialist in an en-route facility is responsible for tactical and

12

strategic support of multiple program areas such as training, quality assurance, traffic management, airspace and procedures, plans and programs, and other facility program areas.  (*Id*.; Plaintiff Dep. at 113, 115).

51. On September 20, 2005, the certificate of eligibles and applications were provided to Boone, the selecting official, in score order.  (Larson Dec. ¶ 8, Att. 5g-5i; Boone Test. at 140).  The list contained the names of 14 candidates.  Plaintiff was listed in the ninth position.  (Larson Dec. ¶ 8, Att. 5g).

52. After consulting with other managers, Hughes recommended to Boone that Tim Sheridan ("Sheridan"), Jay Thomas ("Thomas"), and Jim Saunders ("Saunders") be selected for the three Support Specialist positions.  (Hughes Test. at 67, 112-113).  She recommended Sheridan for one of the positions because Sheridan had been a supervisor at the Indianapolis Center, he was experienced with the Center's new User Request Evaluation Tool, had worked on national work shops, and was a CPC.  (*Id*. at 70-71).  She recommended Saunders because he was one of the few DEO specialists at the Center, was experienced with the new Voice Switching and Control System Training and Backup Switch, and because he was a CPC.  (*Id*.).  She recommended Thomas because he was a Traffic Management Coordinator, was very good with computers, had worked in the 510 technical support shop, had a lot of experience within the Center, and was a CPC.  (*Id*. at 71).

53. On September 8, 2005, Boone selected Sheridan, Thomas, and Saunders for these positions.  (Boone Test. at 187).

54.   Each of these candidates had scores higher than Plaintiff.  (*See* Plaintiff's Ex. 17).

55.   Each of these candidates were CPCs in the en-route environment at the time of their selections and had current experience in the en-route environment.  None of them required training to reach certification prior to beginning the duties of their new positions.  (Boone Dec. ¶ 24; Plaintiff Dep. at 154).

56.   Boone did not select Plaintiff for the position because, while he had years of experience in flight service operation, he did not have the en-route Air Traffic Controller experience that was necessary for the Support Specialist position. (Boone Test. at 182).

**I.     Traffic Management Coordinator Positions**

57.   On July 13, 2005, nine positions for a Traffic Management Coordinator were announced under Vacancy Announcement No. AGL-AT-05-0148-79644M. (Larson Dec. ¶ 8, Att. 6a).  The announcement closed on August 2, 2005.  (*Id*.).

58.   Traffic Management Coordinators are responsible for ensuring that efficient and effective aircraft traffic management is maintained.  (Larson Dec. ¶ 8, Att. 6b; Plaintiff Dep. at 153; Testimony of Stephen Lutomski ("Lutomski Test.") at 500-01).  Traffic Management Coordinators are required to be fully certified and to maintain that currency by acting as an Air Traffic Controller several hours per month.  (Boone Test. at 145-46; Boone Dec. ¶ 20; Larson Dec. ¶ 8, Att. 6b; Lutomski Test. at 502).

59.   On August 24, 2005, the certificate of eligibles and applications were provided to

the Indianapolis Center.  (Larson Dec. ¶ 8, Att. 6m-6u).  Thirty-one candidates were listed on the certificate.  (*Id*.).  Plaintiff was listed in eleventh place.  (*See* Plaintiff's Ex. 20).

60.    Stephen Lutomski, Traffic Manager Officer, and Bill Orr, Support Manager, of the Traffic Management Section were the selecting officials and they provided recommendations to Boone, who was the signatory authority for the positions. (Lutomski Test. at 502-03, 507; Boone Test. at 139-40, 186).

61.    It was important to the selecting officials that the individuals selected for the positions would have an immediate impact on assisting the unit, as the units were undermanned.  (Lutomski Test. at 503; Affidavit of Bill Orr ("Orr Aff.") at 4-5).

62.    The selecting officials did not recommend Plaintiff because he could not immediately begin work in the Traffic Management Coordinator position and because he could not meet the position's qualifications in that he was not a CPC. (Lutomski Test. at 504-05; Orr Aff. at 5).

63.    Boone selected Timothy Fuller ("Fuller"), Wendy Kosmerl, Jeff Bruns, Charles "Pat" Jamison, Manuel Mertens, Gregory Glaser, Kevin Wright, Samuel Crisp, and Shawn Edlund for the Traffic Management Coordinator positions.  (Lutomski Test. at 502-03, 507; Larson Dec. ¶ 8, Att. 6m-6u).

64.    Only Fuller had a higher score than Plaintiff.  (*See* Plaintiff's Ex. 20).

65.    Each of these candidates were CPCs in the en-route environment at the time of their selections and had current experience in the en-route environment.  (Boone

15

Dec. ¶ 24; Plaintiff Dep. at 163).  None of them required training to reach certification prior to beginning the duties of their new positions.  (Boone Dec. ¶ 24).

66.   Had Plaintiff been selected for the position, since he was not a CPC, he would have been unable to perform the duties of the position, which included maintaining operational currency by performing the duties of an Air Traffic Controller for eight hours per month.  (*Id*. ¶ 20).

67.   Selection of Plaintiff would have required his completing the developmental Air Traffic Controller training program, which would take years, before he could perform the duties of the position.  (*Id*. ¶¶ 18, 19).

68.   Plaintiff was notified of his non-selection for the position of Traffic Management Coordinator.  (Larson Dec. ¶ 8, Att. 6v).

**J.      Plaintiff's Efforts to Gain Employment at the Indianapolis Center**

69.   Sometime after February 1, 2005, Plaintiff began visiting the Indianapolis Center to try to find a job with the Indianapolis Center.  (Plaintiff Dep. at 169, 179).

70.   He visited with Hughes about eight times between February 1, 2005, through August 2005.  (*Id*. at 138, 140).  Hughes took the time to talk with him, even though he often did not have an appointment, and she had a very busy job.  (*Id*. at 140-42).

71.   Hughes always acted positively toward Plaintiff and he believed that she was looking for a reason to give him a job at the Indianapolis Center.  (*Id*. at 149).

16

Hughes encouraged Plaintiff to apply for positions at the Indianapolis Center. (*Id.* at 126, 137). During one of these early visits, Plaintiff told her that he had been at the Indianapolis Center and "had only achieved two radar positions." (*Id.* at 150-51).

72. In approximately August 2005, Plaintiff visited Hughes for the last time. (*Id.* at 140-41). The visit lasted about 15 minutes. (*Id.* at 142, 144).

73. They talked about the Indianapolis Center's mentoring program to develop supervisors and managers. (*Id.* at 246). Hughes asked Plaintiff why he should be hired for the vacant positions when there were people at the Indianapolis Center who were part of the mentoring program to chose from. (*Id.* at 246, 256).

74. Plaintiff then told Hughes of his Native American heritage, "hoping that if I was an equal candidate with someone else, maybe that would be a deciding factor to bring more diversity into the workforce." (*Id.* at 137, 140).

75. Hughes did not ask Plaintiff any questions about his Native American heritage. (*Id.* at 145). He contends, however, that Hughes's demeanor changed, and that she went from "smiling to okay, thank you for coming in," and Plaintiff left her office. (*Id.* at 150).

76. Hughes stood up and thanked Plaintiff for coming in. (*Id.* at 145-46).

77. Hughes never said anything derogatory about individuals of Native American heritage, nor does Plaintiff have any idea why she would discriminate against him based upon his Native American heritage. (*Id.* at 147).

78.     Boone did not know Plaintiff was of Native American heritage at the time he made the selections for the vacant positions at issue.  (Boone Test. at 184).

79.     Lutomski, Orr, and Douglas Molin, Director of Tactical Operations for the Eastern Service Area, were not aware of Plaintiff's Native American heritage at the time of the selections either.  (Lutomski Test. at 507; Orr Aff. at 2; Affidavit of Douglas Molin at 5).

## II.     Summary Judgment Standard

A party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law."  FED. R. CIV. P. 56(c).  The court's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.  *See Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003).

In determining whether a genuine issue of material fact exists, the court must view the record and all reasonable inferences in the light most favorable to the non-moving party.  *Heft v. Moore*, 351 F.3d 278, 283 (7th Cir. 2003).  The moving party bears the burden of demonstrating the "absence of evidence on an essential element of the non-moving party's case."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  The non-moving party may not, however, simply rest on the pleadings, but must demonstrate by specific factual allegations that a genuine issue of material fact exists for trial.  *Green v. Whiteco Indus., Inc.*, 17 F.3d 199, 201 (7th Cir. 1994) (citing *Celotex*, 477 U.S. at 322)).

### III.   Discussion

Plaintiff claims he was discriminated against by Hughes and Boone based on his race/national origin when he was not selected for four positions in 2005.  (Plaintiff Dep. at 96, 133, 196).  In order for Plaintiff to prevail on a claim of race/national origin discrimination under Title VII, he must present either direct or indirect evidence that the decision not to select Plaintiff for any of the four open positions was based upon his race/national origin.  *See Alexander v. Wisconsin Dep't of Health & Family Servs.*, 263 F.3d 673, 682 (7th Cir. 2001).  Because the record is devoid of any direct evidence that Defendant's determination to terminate him was based upon his race/national origin, the court utilizes the burden shifting method established in *McDonnell Douglas*.  *Cowan v. Glenbrook Sec. Servs., Inc*., 123 F.3d 438, 442 (7th Cir. 1997); *Weiss v. Coca-Cola Bottling Co. of Chicago*, 990 F.2d 333, 336 (7th Cir. 1993).

To establish a prima facie case under the *McDonnell Douglas* method, the Plaintiff must establish that: (1) he is a member of a protected class; (2) he applied for and was qualified for an open position; (3) he was rejected for the position; and (4) the position was filled with a person not in the protected class who had similar or lesser qualifications than the plaintiff, or the position remained open.  *Johnson v. Nordstrom*, 260 F.3d 727, 732 (7th Cir. 2001); *Howard v. Lear Corp. EEDS and Interiors*, 234 F.3d 1002, 1006 (7th Cir. 2000); *Pafford v. Herman*, 148 F.3d 658, 669 (7th Cir. 1998).  To survive summary judgment, Plaintiff must establish all elements of his prima facie case.  *Hilt-Dyson v. City of Chicago*, 282 F.3d 456, 465 (7th Cir. 2002).

19

If Plaintiff does not establish a prima facie case, the burden of production shifts to the Defendant, who must offer a legitimate, nondiscriminatory reason for the challenged action. *Pafford*, 148 F.3d at 665.  If the Defendant puts forward such a reason, then Plaintiff must demonstrate a genuine issue of material fact as to whether the reason is pretextual.  *Id.*

## A.    Discriminatory Animus

The Defendant sets forth a number of reasons why summary judgment is appropriate in this case.  The court will begin its discussion with the first of these reasons – i.e., whether the decision maker in this case, Boone, was aware of Plaintiff's Native American heritage, and thus, exhibited discriminatory animus toward Plaintiff in making his selections for the vacancy positions at issue.  *Pourghoraishi v. Flying J, Inc.*, 449 F.3d 751, 757 (7th Cir. 2006) ("Of course, the defendants could not have intended to discriminate against Pourghoraishi on the basis of race if they were unaware of his race . . ."); *Holmes v. Potter*, 384 F.3d 356, 362 (7th Cir. 2004) (noting that "an employer's lack of knowledge about a protected category rings a death knell for discrimination claims.");  *MaKay v. Town & Country Cadillac, Inc.*, 2002 WL 664024, at *10 (N.D. Ill. April 23, 2002) ("A basic requirement to establishing a prima facie case of retaliation is that the employer must be aware of the employee's statutorily protected expression before the adverse action is taken against the employee."); *Owens v. United States of America*, 2004 WL 2137677, at *14 (S.D. Ind. Aug. 17, 2004) (finding "awareness" of prior EEO complaints against others not sufficient to establish motive for retaliation).

In Plaintiff's Response Brief, Plaintiff asserts that Boone "was aware he was of Native American origin." (Plaintiff's Response at 33). In support of this claim, Plaintiff contends that he sent a form identifying himself as Native American with his applications to the Illinois Great Lakes Regional Human Resources Office. (Granger Test. at 393; Plaintiff Dep. at 231, 234). However, it is undisputed that these forms were retained in Illinois and were not forwarded to the Indianapolis Center. (Larson Dec. ¶ 6). There is no evidence that Boone or anyone else at the Indianapolis Center ever saw these forms. Plaintiff also claims that he was called "Chief" in 1997, before he transferred to the Terre Haute AFSS. (Plaintiff Dep. at 73-75). However, Plaintiff provides no evidence that Boone ever called him "Chief" or was ever aware of this nickname. In fact, Plaintiff does not know Boone at all, and he admits that Boone did not know his ethnicity until at least 2005. (*Id.* at 134, 151, 228; *see also* Hughes Test. at 118; Boone Test. at 175, 181). Because Boone did not know of Plaintiff's ethnicity until he was contacted by the EEO Investigator concerning Plaintiff's October 2005 complaint, (Boone Test. at 175, 181), he had no motive to discriminate against Plaintiff, and Plaintiff's claims fail as a matter of law. *See Tomanovich v. City of Indianapolis*, 457 F.3d 656, 668-69 (7th Cir. 2006); *Luckie v. Ameritech Corp.*, 389 F.3d 708, 714-15 (7th Cir. 2004).

In an effort to overcome this obstacle, Plaintiff argues that Hughes, whom he had told about his ancestry in August 2005, "did not refer [him] for the job because of that reason and then instructed Dave Boone not to hire [him] . . .". Because Hughes was not the ultimate decision maker, Plaintiff must come forward with some evidence that she

influenced the decision not to hire him, either by withholding relevant information or providing false information to Boone. *Dorsey v. Morgan Stanley*, 507 F.3d 624, 628 (7th Cir. 2007). Even if the information was incorrect, however, "'where a decision maker is not wholly dependent on a single source of information, but instead conducts its own investigation into the facts relevant to the decision, the employer is not liable for an employee's submission of misinformation to the decision maker.'" *Metzger v. Illinois State Police*, 519 F.3d 677, 682 (7th Cir. 2008) (quoting *Brewer v. Bd. of Trs. of Univ. of Ill.*, 479 F.3d 908, 918 (7th Cir. 2007)).

Here, Plaintiff offers no evidence that Hughes conveyed any misinformation to Boone or that she withheld any relevant information from Boone concerning Plaintiff. (Plaintiff Dep. at 135-37, 163-64, 190-91, 197). Nor did Boone rely exclusively on information provided by Hughes; he talked to other managers as well. Moreover, Boone was well aware of the operational currency requirements for each of the positions, and that Plaintiff could not meet those requirements. Plaintiff's claims must fail for this reason alone. *See Dorsey*, 507 F.3d at 629; *Metzger*, 519 F.3d at 682-83.

### B. Plaintiff's Prima Facie Case

Defendant also argues that Plaintiff is not able to establish elements (2) and (4) of his prima facie case – i.e., that he was qualified for the positions he applied for and that the employees who were selected for those positions were not members of the protected class and were not better qualified than he.

### 1.    Plaintiff's Qualifications

It is undisputed that FAA directives require that Operations Supervisors and Traffic Management Coordinators maintain operational currency by performing the duties of a CPC for several hours per month.  (Boone Dec. ¶ 20).  It is undisputed that at the Indianapolis Center, Support Specialists are likewise required to maintain operational currency as a requirement of the position.  *Id*.  In this case, it is undisputed that Plaintiff was not a CPC at the time he applied for the positions, and he could not meet this objective requirement.  As such, Plaintiff was not qualified for the positions, and his claims fail.

Despite not meeting this key factor, Plaintiff argues that he was qualified because his name was listed on the certificate of eligibles and the vacancy announcements did not specify that only CPCs should apply.  However, Plaintiff has pointed to no authority supporting his contention that a candidate is qualified for a particular position simply because his application met certain basic requirements and was referred to the selecting official.  Moreover, the Support Specialist announcement did require applicants to be able to maintain operational currency to be qualified for the position.  (Larson Dec. ¶ 8, Att. 5a at 1).  Likewise, FAA directives required Operations Supervisors and the Traffic Management Coordinators to maintain operational currency as well.  (Boone Dec. ¶ 20).  Because Plaintiff could not maintain operational currency (he was not a CPC), he was not qualified for the positions.

Even if Plaintiff could show that he was qualified, Plaintiff still cannot state a

23

prima facie case of discrimination because he cannot show that he had similar or greater

qualifications than the selectees.  As discussed above, Plaintiff was not a CPC, and it

would take years for him to be trained as a CPC.  In contrast, all the selectees were CPCs

in the en-route environment at the time of their selections.  None of the selectees required

training to reach certification prior to beginning the duties of their new positions.  Further,

unlike the selectees, Plaintiff had no experience with the Indianapolis Center's recent

changes in procedures, automation, and infrastructure.

With respect to the 120-day Operations Supervisor position, no one was selected

for the position and the position did not remain open.  *Howard*, 234 F.3d at 1006 (where

the position is not filled, the plaintiff must show that the vacancy remained open).

Further, Plaintiff was not selected for the position for the same reasons he was not

selected for the other positions: he was not a CPC and he did not have recent experience

with the new systems at the Indianapolis Center.

Plaintiff also argues that he was qualified or more qualified than the Traffic

Management Coordinator and Operations Supervisor selectees because he had higher

"scores."  As noted previously, an applicant's "scores" were calculated based upon the

applicant's education and awards,  (Granger Test. at 402, 428), and were never provided

to the selecting officials for consideration.  (*Id*. at 428).  Thus, the score was one of many

tools from which the selecting officials could make their decision.  (*Id*. at 431-32).  For

these reasons, the court finds that Plaintiff has failed to establish a prima facie case of

national origin/race discrimination.

24

### C.     Pretext

Even if Plaintiff were to establish a prima facie case of discrimination, the

Defendant has come forward with legitimate, nondiscriminatory reasons for not selecting

Plaintiff for these positions, including the 120-day Operations Supervisor position.  The

duties of each position required the hiree to be a CPC in the en-route environment.

Further, the Indianapolis Center had undergone significant changes in procedures,

automation, and infrastructure since Plaintiff had last worked at the Indianapolis Center.

(Boone Dec. ¶ 19).  Plaintiff was unable to meet these requirements without first

requiring extensive training before he would be able to perform the duties of these

positions.

Because the Defendant has identified legitimate, nondiscriminatory reasons for not

hiring Plaintiff for the positions, the burden shifts back to Plaintiff who must prove that

these justifications are a pretext for discrimination.  *See Russell v. Bd. of Tr. of the Univ.*

*of Ill. at Chicago*, 243 F.3d 336, 344 (7th Cir. 2001).  Pretext "means a dishonest

explanation, a lie rather than an oddity or an error.  A 'pretext for discrimination' means

more than an unusual act; it means something worse than a business error; 'pretext'

means deceit used to cover one's tracks."  *Grube v. Lau Indus., Inc.*, 257 F.3d 723, 730

(7th Cir. 2001) (internal quotations and citations omitted).

Plaintiff advances a number of arguments in support of his pretext argument.  First,

Plaintiff argues that being a CPC was not a requirement of any of the positions Plaintiff

sought and was not listed on the vacancy announcements for the positions.  As previously

noted, FAA directives require that Operations Supervisors and Traffic Management Coordinators maintain operational currency. (Boone Dec. ¶ 20). Support Specialists are likewise required to maintain operational currency. (*Id.*; Larson Dec., Att. 5a; Boone Test. at 182). Indeed this requirement was on the vacancy announcement for the Support Specialist position. (Larson Dec., Att. 5a; Plaintiff's Ex. 15).

Second, Plaintiff argues that he was, in fact, fully certified because he was a FPL at an AFSS. Although FPLs and CPCs are both air traffic controllers classified within the FAA personnel system as FAA 2152-series, it is undisputed that the duties of a CPC, as well as its certification requirements, are dramatically different from those of an FPL in an AFSS. (Larson Dec. ¶ 4; Boone Dec. ¶ 22; Plaintiff Dep. at 21-24, 27-32, 85).

Third, Plaintiff claims that all candidates for the Traffic Management Coordinator position required training, and thus, the Defendant's contention that it would take years for Plaintiff to become fully certified is belied by the record. Plaintiff's evidence, however, does not support his argument, as he cites to the vacancy announcements at issue and to his own self-serving affidavit. "An employee's self-serving statements about ability . . . are insufficient to contradict an employer's negative assessment of that ability." *Sublett v. John Wiley & Sons, Inc.*, 463 F.3d 731, 740 (7th Cir. 2006) (internal quotations and citations omitted). It is undisputed that it takes years to become certified as a CPC. (Boone Dec. ¶¶ 18-19; Plaintiff Dep. at 131). In contrast, while some of the selectees may have required additional training on specific areas to which they may be assigned, each of the selected candidates were already certified and were already familiar

26

with the new systems at the Indianapolis Center.  (Boone Dec. ¶ 24).

Fourth, Plaintiff claims that the FAA gave "contradictory and mutually exclusive reasons" for not selecting Plaintiff for the 120-day Operations Supervisor position.  The basis for Plaintiff's argument stems from Defendant's answer to Plaintiff's EEO Administrative Interrogatory which asked for the reasons "in whole or in part" that the FAA did not hire Plaintiff for the 120-day Operations Supervisor position.  The FAA responded that he was not selected because Plaintiff was not a certified CPC and because he did not have recent experience at the Indianapolis Center.  The FAA's response was, at a minimum, part of the reason Plaintiff was not selected for the position.  (Boone Dec. ¶¶ 18-20).  The certificate expired with no selection made.  Plaintiff's contention that Silvius was given the temporary position, and that it turned into a permanent position, is not supported by admissible evidence and contradicts Plaintiff's own testimony that no one was selected for the position.  (*See* Plaintiff Dep. at 193-95).

Finally, Plaintiff claims two other FAA employees RIF'd in 2005, who did not have "center" experience, were selected for the type of positions that he applied for but was denied.  For example, Plaintiff claims that Dominique Sorbo ("Sorbo") was not a CPC but was selected in 2005 for the position of Support Specialist at the Cleveland Air Route Traffic Control Center.  Plaintiff also claims that Lynette Jamison ("Jamison") was not a CPC, but was selected for a position in 2005 as an Operations Supervisor in the Washington (D.C.) Air Traffic Control Center.  (Plaintiff Aff. ¶¶ 117-122, 124).  Plaintiff's allegations regarding these women are not factually accurate.  Sorbo was

selected as a Program Analyst in 2005, not as a Support Specialist.  (Declaration of

Dominique Sorbo ¶ 6).  Jamison was selected as a Flight Data Communications Unit

Supervisor, not as an Operations Supervisor.  (Declaration of Lynette Jamison, ¶¶ 5-6).

As shown above, Plaintiff has failed to carry his burden of showing that he was not

selected for any of the four vacancy openings because of his Native American heritage.

Although he may not agree with Defendant's business decisions, such is not the subject of

a pretext analysis.  Accordingly, the court finds that the Plaintiff's claim of race/national

origin discrimination fails as a matter of law.

### D.    Mixed Motive Analysis

Finally, Plaintiff contends that even if some of the reasons advanced by Defendant

were legitimate for choosing not to hire him for any of the four available positions, "there

is still sufficient evidence to conclude that the FAA had mixed motives."  (Plaintiff's

Response at 31).  A mixed motive case is one in which legitimate and illegitimate reasons

play a role in the decision at issue.  *Hossack v. Floor Covering Assoc. of Joliet*, 492 F.3d

853, 860 (7th Cir. 2007).  "An employer can avoid a finding of liability in such a case by

proving that it would have made the same decision even if it had not allowed

[race/national origin] to play a discriminatory role . . . ."  *Id.*

Here, Plaintiff has presented no evidence that his ethnicity had anything to do with

his non-selection.  His testimony that Hughes' demeanor changed when he told her he

was of Native American heritage does not amount to racism and is far too vague to be a

basis upon which a factfinder could find racial bias.  *See Pafford*, 148 F.3d at 666

(rejecting as evidence of discrimination "an unfriendly look," refusal to eat tortillas because "she did not trust him," and other similar comments).  In fact, Plaintiff has no evidence that Hughes, who was not the final decision maker, ever said anything derogatory about him or individuals of Native American heritage.  (Plaintiff Dep. at 147).  Moreover, Plaintiff does not question that Boone truly believed that the candidates selected for the positions were the best qualified candidates for the positions.  (*Id.* at 164-65).  For these reasons, the court finds Plaintiff has presented no evidence of a mixed motive, and thus, the court **GRANTS** Defendant's Motion for Summary Judgment.

## IV.    Conclusion

For the reasons set forth above, the court hereby **GRANTS** Defendant's Motion for Summary Judgment (Docket # 35) on Plaintiff's claim of race/national origin discrimination.

**SO ORDERED** this 30th  day of November 2009.

RICHARD L. YOUNG,  CHIEF JUDGE
United States District Court
Southern District of Indiana

Electronic Copies to:

Michael C. Kendall
KENDALL LAW OFFICE
mckatlaw@aol.com

Debra G. Richards
UNITED STATES ATTORNEY'S OFFICE
debra.richards@usdoj.gov